IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ROCKY MOUNTAIN WILD, BIODIVERSITY CONSERVATION ALLIANCE, COTTONWOOD ENVIRONMENTAL LAW CENTER, and WILDWEST INSTITUTE, | CV 13–42–M–DWM |
| Plaintiffs, | |
| vs. | ORDER |
| U.S. FISH & WILDLIFE SERVICE, DANIEL M. ASHE, and S.M.R. JEWELL, | **FILED** |
| Defendants. | SEP 2 9 2014 |

Clerk, U.S. District Court
District Of Montana
Missoula

**INTRODUCTION**

Plaintiffs are various environmental organizations who challenge the United States Fish and Wildlife's ("the Service") negative 12-month finding for the white-tailed prairie dog. They claim the 12-month finding violates the Endangered Species Act ("ESA") because the Service failed to adequately consider: (1) the species' historical range; (2) the individual and cumulative impacts of threats to the species, and (3) the best available science. For the reasons discussed below, Plaintiffs' motion is granted in part and denied in part.

**BACKGROUND**

## I.    The ESA

The ESA, 16 U.S.C. § 1531 *et seq.*, was enacted in 1973 "to provide a

means whereby the ecosystems upon which endangered species and threatened

species depend may be conserved, [and] to provide a program for the conservation

of such endangered species and threatened species." *Id.* at § 1531(b).  As defined

in the ESA, an "endangered species" is one that is "in danger of extinction

throughout all or a significant portion of its range." *Id.* at §§ 1532(6), 1533(a)(1).

A "threatened species" is one that "is likely to become an endangered species

within the foreseeable future throughout all or a significant portion of its range."

*Id.* at § 1532(20).

The ESA delegates authority to determine whether a species should be listed

to the Secretary of the Interior, who in turn has delegated that authority to the

Director of the Service.  The Service is required to evaluate whether a species is

threatened or endangered based upon five listing factors set forth in ESA Section

4(a)(1):

> (A) the present or threatened destruction, modification, or curtailment
> of [the species'] habitat or range;
> (B) overutilization for commercial, recreational, scientific, or
> educational purposes;
> (C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or
(E) other natural or manmade factors affecting [the species']
continued existence.

*Id.* at § 1533(a)(1).  Listing may be done at the initiative of the Service or in

response to a petition from an "interested person."  *Id.* at § 1533(b)(3)(A).  After

receiving a petition to list a species, the Service is required to determine "whether

the petition presents substantial scientific or commercial information indicating

that the petitioned action may be warranted."  *Id.*  Such a finding is termed an

"initial finding" or a "90-day finding."

If the Service finds that a petition presents substantial information, it makes

a "positive" 90-day finding and initiates a full status review of the species, in

which is goes beyond the bounds of the petition and gathers all the best available

scientific and commercial data on the species.  *Id.* at § 1533(b)(1)(A), (3)(A).  The

Service applies this information to the listing factors to determine whether

proposal of a rule listing the species is warranted.  *Id.* at § 1533(b)(3)(B).  This

determination is known as a "12-month finding."  The Service is required to make

a 12-month finding "solely on the basis of the best scientific and commercial data

available to [it] after conducting a review of the status of the species and after

taking into account" existing efforts to protect the species.  *Id.* at § 1533(b)(1)(A);

*see also* 50 C.F.R. § 424.11(b), (f).

-3-

## II.    The White-Tailed Prairie Dog

The white-tailed prairie dog ("prairie dog") is one of five prairie dog species

that inhabit North America.  AR 14076.[1]  It occupies a small area in south-central

Montana, much of Wyoming, western Colorado, and northeastern Utah.  AR

14079.  In July 2002, several organizations and individuals petitioned the Service

to list the prairie dog as threatened or endangered.  AR 14075.  On November 9,

2004, the Service published a negative 90-day finding on the petition.  *Id.*  After

petitioners filed suit challenging the 90-day finding, the Service agreed to publish

a 12-month finding for the prairie dog ("the Finding").  In June 2010, the Service

issued the Finding, concluding that the prairie dog was not "threatened" or

"endangered" as those terms are defined under the ESA.  75 Fed. Reg. 30338

(June 1, 2010); AR 14075-100.  That Finding provides the basis for the issues

presented here.

### SUMMARY CONCLUSION

The Finding in this case is replete with the assertion that there is insufficient

data to draw conclusions about many aspects of the prairie dog.  However,

Plaintiffs have presented evidence that the record included data and information

---

[1]    Citations to the Administrative Record are formatted as "AR" followed by the
Bates stamp number.

-4-

not addressed by the Service in reaching its conclusion.  It is the role of the

Congress to tell the agency what data it should and should not rely on.  The

agency is required by Congress by virtue of the Administrative Procedure Act

("APA") to engage in rational decision-making and it is bound by the ESA to use

the best available science.  Ultimately, the Service failed to consider an important

aspect of the problem when it failed to consider historical range and failed to

discuss certain individual threats without considering their potential to

cumulatively impact the species.  The Service's determination that the regulatory

mechanisms affecting oil and gas development are adequate is unreasonable in

light of its threat assessment.  Finally, the Service did not consider the best

available science when it relied on the absence of data in reaching a conclusion

without explaining why it chose not to rely on the existing data.  The post-hoc

rationalizations of Defendants cannot, and do not, make up for these deficiencies.

The matter is remanded accordingly.  The Service met the requirements of the

APA and the ESA in all other respects.

**LEGAL STANDARDS**

**I.    Summary Judgment**

A party is entitled to summary judgment if it can demonstrate "that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  On a motion for summary judgment, this Court must determine whether a fair-minded jury could return a verdict for the non-moving party. *Id.* at 252.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment; factual disputes which are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

## II.    Administrative Procedure Act

Courts review claims regarding the ESA under the APA, 5 U.S.C. § 706 *et seq. Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). Under the APA, a "reviewing court shall hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).  The court's scope of review is narrow, and the court should "not [] substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A decision is arbitrary and capricious:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the

agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Gardner v. U.S. Bureau of Land Mgt.*, 638 F.3d 1217, 1224 (9th Cir. 2011).

An agency's actions are valid if it "considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (citation and internal quotation marks omitted). Review of the agency's action is "highly deferential, presuming the agency action to be valid." *Buckingham v. Secy. of U.S. Dept. of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010). However, this presumption does not require courts to "rubber stamp" administrative decisions "they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco & Firearms v. F.L.R.A.*, 464 U.S. 89, 97 (1983) (internal quotations omitted).

## ANALYSIS

The crux of this case is whether the Service adequately considered the data present in the record before determining that the prairie dog is neither endangered nor threatened. Plaintiffs argue that the Service failed to adequately consider : (1) the species' decline over a significant portion of its range, (2) threats to the species, or (3) the best available science. These claims are only partially correct.

## I.  Population and Distribution Data

### A.   The Service failed to adequately consider the species' decline over a significant portion of its range.

The ESA requires the Service to consider whether a species is threatened or endangered by "the present or threatened destruction, modification, or curtailment of its habitat or range."  16 U.S.C. § 1533(a)(1)(A).  As stated by the Ninth Circuit,

> a species can be extinct "throughout ... a significant portion of its range" if there are major geographical areas in which it is no longer viable but once was. Those areas need not coincide with national or state political boundaries, although they can. The Secretary necessarily has a wide degree of discretion in delineating "a significant portion of [the species'] range," since the term is not defined in the statute.

*Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001).  However, if the record shows that the area where the species is expected to survive is much smaller than its historical range, "the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" *Id.*

Here, the Service determined that the listing of the prairie dog is not warranted.  AR 14075-100.  The Service found that the most substantial factors affecting the species—plague and habitat fragmentation due to oil and gas development—are not of a magnitude or imminence that indicate the prairie dog is

-8-

in danger of extinction, or likely to become endangered, throughout all or a significant portion of its range. AR 14100. Plaintiffs challenge this determination, contending the Service failed to adequately consider the contraction of the species' range from historic levels and failed to consider whether the habitat and colonies that have been lost constitute a "significant portion" of the prairie dog's range. Defendants claim that the Service's conclusion is rational based on the dearth of historical population data and the agency's threat assessment. The Service failed to consider an important aspect of the problem when it failed to consider historical range thus necessitating remand for further consideration.

The focus of the APA is reasoned decisionmaking. The Service must examine the relevant data and articulate a satisfactory explanation for its actions, including a rational connection between the facts found and the choices made. *Gardner*, 638 F.3d at 1224. The record here shows that prairie dog range has decreased. *See* AR 14079, 14092 (noting a loss of occupied habitat in Montana and localized declines in Colorado). "At the heart of this issue is a quantitative assessment of loss." AR 2491. The Service, as mentioned above, has wide discretion to determine what constitutes a significant portion of a species' range. *Norton*, 258 F.3d at 1145. However, consideration of historic range is a necessary

-9-

part of this inquiry. *Tuscon Herpetological Socy. v. Salazar*, 566 F.3d 870, 876

(9th Cir. 2009) ("Before the Secretary can properly consider whether the areas

where the lizard is 'no longer viable' are significant, it is of course necessary to

identify those areas.")  The Service did not consider an important aspect of the

problem when it concluded that the prairie dog's distribution had not substantially

changed without analyzing historical range. *State Farm*, 463 U.S. at 43 ("an

agency [decision] would be arbitrary and capricious if the agency . . . entirely

failed to consider an important aspect of the problem.").

 The Finding repeatedly avers a lack of historical population information

prevented the Service from making a determination as to rangewide population

trends or changes in habitat.  AR 14079.  However, according to two prairie dog

studies—referred to throughout the Finding as "Pauli" and "Knowles"—historical

estimates indicate the prairie dog's range has contracted over time.  AR 4626; AR

2490-91.[2]  Pauli estimates that the current occupied area of the prairie dog

represents a range contraction of 99 percent.  AR 4626.  Knowles agrees that range

contraction has occurred, but states that the that there is no evidence of a

significant geographic range contraction on a broad scale.  AR 2486.  Despite

_____

 [2]     Jonathan Pauli et al., *White-tailed Prairie Dog (*Cynomys leucurus*): A Technical
Conservation Assessment* (Nov. 13, 2006), AR 4614-57; Craig Knowles, *Status of White-tailed
and Gunnison's Prairie Dogs* (Nov. 2002), AR 2478-517.

these estimates, the Finding only cites these studies for the proposition that

historical data is limited and that there is no affirmative evidence of a substantial

change in distribution. AR 14079-80. Reading the Finding creates the impression

that not only is there no definitive historical data as to prairie dog range, but that

there is no data of any kind. This is simply not the case. *S.W. Ctr. for Biological*

*Diversity v. Babbitt*, 215 F.3d 58, 60-61 (D.C. Cir. 2000) (holding that in the

absence of conclusive data the agency may, and indeed must, rely on inconclusive

data if that is the "best scientific data available."); *Kern Co. Farm Bureau v. Allen*,

450 F.3d 1072, 1080 (9th Cir. 2006) (asserting that the best available data

requirement prohibits an agency from disregarding available scientific evidence

that is in some way better than the evidence the agency relies on); *WildEarth*

*Guardians v. Salazar*, 741 F. Supp. 2d 89, 93 (D.D.C. 2010) (noting that Utah

prairie dog census numbers were not available until 1976 and relying on historical

estimates for earlier population data). Although the Service is not required to rely

on information it believes is speculative or unreliable,[3] *see Building Indus. Assn.*

*of Superior Cal. v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001) ("The

---

[3]      The Defendants' argument that the Service did not rely on Pauli or Knowle's
historical population estimates on the grounds that they are speculative or unreliable is rejected
because these rationalizations are not in the Finding. *See Ctr. for Native Ecosystems v. U.S. Fish
& Wildlife Serv.*, 795 F. Supp. 2d 1199, 1208 (D. Colo. 2011) (refusing to consider post-hoc
arguments).

Service may not base its listings on speculation or surmise or disregard superior data[.]"), the agency must make plain its course of inquiry, its analysis, and its reasoning, *see Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1028 (9th Cir. 2011) ("It is not enough for the Service to simply invoke 'scientific uncertainty' to justify its action.").

Here, the Service reached a "no substantial change in distribution" conclusion while at the same time averring a complete absence of data as to that issue. Had the Finding explained its historical range determination, the agency's conclusion would be entitled to deference. *Ariz. Cattle Growers' Assn. v. U.S. Fish & Wildlife, Bureau of Land Mgt.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (reasserting that the Court may not substitute its judgment for that of the agency). The failure to do so makes the Finding arbitrary, capricious, and in violation of the ESA. *Sierra Club v. E.P.A*, 346 F.3d 955, 961 (9th Cir. 2003) ("While [a court's] deference to the agency is significant, [it] may not defer to an agency decision that is without substantial basis in fact." (internal quotation marks omitted)). The Service must rationally explain why the uncertainty regarding historical range counsels in favor of a finding of no substantial change rather than the opposite conclusion. *See Tucson Herpetological Socy.*, 566 F.3d at 879 ("If the science on population size and trends is underdeveloped and unclear, the Secretary cannot

-12-

reasonably infer that the absence of evidence of population decline equates to evidence of persistence."). The Finding does not provide a non-conclusory basis for believing that the prairie dog persists in a substantial portion of its range. Therefore, the Finding is remanded to the agency for further consideration.

### B.   The Service's measurement of distribution and abundance was rational.

Plaintiffs also challenge the geographic level of analysis used by the Service in its consideration of population distribution. The Finding uses "gross range," "predicted range," and "mapped occupied habitat" to evaluate the status and threats to the species. AR 14077. The term "gross range" is used to describe "the outer boundary identifying the overall rangewide distribution of the . . . prairie dogs." *Id.* "Predicted range" is a subset of gross range and "represents a more accurate spatial representation of the[ir] potential range," and is defined "using habitat characteristics of vegetation, land use, slope, and elevation." *Id.* "Occupied habitat" is used to measure population trends and land actually inhabited by the species. AR 14079. The agency's explanation for why it used certain metrics in certain instances is reasonable.

Plaintiffs argue that the record contains clear evidence of population decline and precise habitat data that was not considered by the Service. However,

Plaintiffs' contention that more specific information may have been available does

not rebut or call into question the Service's analysis of the various habitat

measurements. The Finding specially notes that it includes gross range data across

all the states in the species' range (Montana, Wyoming, Colorado, and Utah),

predicted range for Colorado, and mapped occupied habitat for Utah. AR 14077.

This indicates that where the Service felt more specific data was available and

reliable, it considered it. As argued by Defendants, the fact that the Service had

"mapped habitat" information does not necessarily mean the Service also

possessed the underlying data on "mapped occupied habitat" or that it did so for

the entirety of the prairie dog's range. Although the Service is required to make

its determination on the best scientific evidence available, there is no indication

that its decision to employ certain metrics in certain circumstances undermined

that obligation.

II.     **Threats Analysis**

Plaintiffs also insist that the Service acted arbitrarily and capriciously when

it failed to consider the listing factors' cumulative effect on the species. The

Service is required to evaluate whether a species is threatened or endangered:

> because of any one or a combination of the following factors:
> (1) the present or threatened destruction, modification, or curtailment
> of [the species'] habitat or range;

      (2) overutilization for commercial, recreational, scientific, or
educational purposes;
      (3) disease or predation;
      (4) the inadequacy of existing regulatory mechanisms; or
      (5) other natural or manmade factors affecting [the species']
continued existence.

50 C.F.R. § 424.11(c) (citing the factors listed under 16 U.S.C. § 1533(a)(1)).

This language makes plain that individual consideration of each of the five factors

does not suffice as the Service must also consider the impact upon the species of

all the factors together. *See Carlton v. Babbitt*, 900 F. Supp. 526, 530 (D.D.C.

1995) ("[The Service] must consider each of the listing factors singularly and in

combination with the other factors.").

      The Service considered the listing factors' cumulative effects.   The

Finding's cumulative impact analysis begins by noting that only a finite set of

potential threats to prairie dogs are likely to exist in the future.  AR 14099.  Of

these, the Finding concludes that the threats with the greatest potential for

cumulative impacts are plague and oil and gas development.  AR 14098-99

(summarizing and comparing magnitude of various threats to the prairie dog).

Plaintiffs claim the Service improperly considered the following potential threats

in isolation: oil and gas development, oil shale development, agricultural land

conversion, grazing, urbanization, climate change, invasive species, plague,

interspecies competition, predation, hunting, off-road vehicle use, inadequate management practices, poisoning, and toxic chemical leakage associated with hydraulic fracturing and oil and gas reserve pits.  With the exception of off-road vehicle use and the potential for toxic chemical leakage, each of these impacts is discussed to some degree in the Finding.

### A.    The Service cannot discount threats solely on the basis that they are individually insignificant.

Plaintiffs initially argued that the Service was required to independently consider off-road vehicle use and toxic chemical leakage as part of its analysis.  In their reply, however, Plaintiffs narrow their focus to the potential impacts of these two activities in light of their contribution to other threats.  Defendants argue that the Service is not required to investigate hypothetical threats and that it considered off-road vehicle use and toxic leakage but dismissed them as not threatening or meriting further inquiry.  Defendants' argument is both legally and factually deficient.

Contrary to Defendants' contention, the record shows the potential threat from off-road vehicle use and toxic chemical leakage or spills is not hypothetical. According to the Bureau of Land Management's Statewide Programmatic White-tailed Prairie Dog Biological Evaluation (2007),

> If [off-road vehicle] use were to occur in a [prairie dog] colony, there is
> a possibility of direct vehicle mortality or crushing of burrows or burrow
> entrances, however, this activity would ve a very rare occurrence. [Off-
> road vehicle] users gain access to remote areas include prairie dog
> complexes.  This access may result in recreational shooting of prairie
> dogs, which can have an additive effect with plague, and slow post-
> plague recovery of prairie dog complexes.

AR 14290.  Although the Evaluation concludes that there is a "limited potential

for [off-road vehicle] use to impact suitable [prairie dog] habitats[,]" *id.*, this

conclusion does not foreclose the possibility that when considered in conjunction

with other activities, the resulting impact may be significant.  Similarly, the record

shows that toxic leakage or spills may have an impact on prairie dogs through

ingestion or physical contact.  AR 10611.  Once again this information is provided

with the caveat that it may not be a "big threat," but that does not foreclose the

possibility of it contributing to a cumulative threat.  The Service cannot

"disregard[] the reality that small, non-threatening injuries can incrementally lead

to a fatal result, whether it is the 'straw that broke the camel's back' or 'death by a

thousand cuts.'" *Ctr. for Native Ecosystems v. U.S. Fish & Wildlife Serv.*, 795 F.

Supp. 2d 1199, 1207 (D. Colo. 2011).

 The Service cannot discount activities merely on the basis that they may be

individually insignificant.  To the extent that it did so, the agency has acted

arbitrarily and capriciously.

**B.    The Service adequately considered the cumulative impacts of the § 1533(a)(1) factors addressed in the Finding.**

Review of the Finding discloses that the Service specifically addresses each of the five factors listed in the statute and the regulation.  *See* 16 U.S.C. § 1533(a)(1); 50 C.F.R. § 424.11(c).  Viewing each factor in isolation, the Service recognized the potential difficulties in oil and gas development, oil shale development, agricultural land conversion, grazing, urbanization, climate change, fire occurrence and suppression,  invasive species, plague, interspecies competition, predation, hunting, inadequate management practices, and poisoning. AR 14080-99.  For most of these factors, the Service concluded that each factor alone is not "a significant threat to the species now or in the foreseeable future." *See* conclusions on AR 14085 (oil shale and tar sands, mineral development, solar energy, wind energy), 14086-87 (urbanization), 14087 (agricultural land conversion), 14088 (grazing, fire occurrence/suppression, invasive plant species), 14091 (recreational shooting), AR 14094 (predation), 14098 (poisoning, competition).  The Service determined other factors, however, although insignificant when considered in isolation, have the potential to cumulatively impact the prairie dog: climate change, AR 14089-90; plague, AR 14091-94; oil and gas development, AR14099-100; and regulatory mechanisms, AR 14097.

The Finding concludes with a discussion of the collective impacts of the

factors, delineating between those factors it believes will have a continuing

impact on the species and those that will not. AR 14099. As stated in the Finding:

> We believe that collectively, these activities have resulted in the
> presumed reduced abundance of white-tailed prairie dog from historical
> levels. . . . Many of these factors (grazing, urbanization, fire
> suppression, agricultural land conversion, and poisonings) were at much
> greater magnitude in the past and are not currently impacting the species
> with the same intensity. Other threats (oil and gas development, climate
> change, shooting, plague, and invasive plant species) can be expected
> to continue into the future. Of these, we consider plague and oil and gas
> development to have the greatest potential for cumulative impacts.

*Id.* The Service did not fail to consider an important aspect of the problem when it

analyzed the § 1533(a)(1) factors. It determined which factors it felt would

cumulatively threaten the prairie dog and discussed the potential implications of

those combinations in the Finding. AR 14099-100. Plaintiffs may disagree with

the result or insist that the analysis could have been performed differently, but it is

necessary to uphold the agency's decision so long as it is supported by the record,

even if the record could support alternative findings. *Ark. v. Okla.*, 503 U.S. 91,

112-13 (1992). Plaintiffs' insistence that the Service omitted numerous

combinations of factors from its cumulative analysis is unpersuasive. *See Cook*

*Inlet Beluga Whale v. Daley*, 156 F. Supp. 2d 16, 22 (D.C.C. 2001) (holding that

listing is not required "simply because the agency is unable to rule out factors that

-19-

could contribute to a population decline."). Plaintiffs have not presented

conclusive evidence to rebut the Service's determination that the threats contained

in the Finding, either alone or in concert, are not likely to cause the "destruction,

modification, or curtailment of [the species'] habitat or range." 16 U.S.C.

1533(a)(1)(A).

### C.   The Service did not improperly minimize threats.

As was argued in regard to historic range, Plaintiffs insist that the level of

analysis used by the agency vastly overestimates the amount of habitat available to

the species and results in an inaccurate threat determination. According to the

Finding, "predicted range"—which both parties agree is a more accurate measure

of areas that currently have the potential to be occupied by prairie dogs than "gross

range"—makes up only 65 percent of the species' gross range. AR 14079.

Plaintiffs maintain that even this measurement improperly overestimates the

habitat of the species, contending only 2.6 percent of the predicated range and 1.6

percent of the gross range is currently occupied. AR 4408, 9034. According to

Plaintiffs, the Service should have used colony information in its assessment.

Defendants do not dispute that more specific habitat descriptions are preferable.

However, Defendants contend the Service's analysis is circumscribed by the

available information and its utility when considered with other data.

Plaintiffs specifically focus on the Finding's discussion of oil and gas development in Wyoming, contending the Service's determination that high yield leases will only impact 4.2 percent of the species' predicted range, AR 14083, does not address the percentage of land actually used by the species that will be impacted. In response, Defendants insist that "Plaintiffs have pointed to no source of mapped occupied habitat or predicted range data for Wyoming, and thus have asked the Service to rely on science that does not yet exist." (Defs.' Br. in Support, Doc. 31 at 21.) Neither side is entirely correct.

The record reflects piecemeal data as to occupied habitat and maps of that habitat across Wyoming, Montana, Colorado, and Utah (therefore, Defendants are incorrect in saying such data does not exist). However, the Finding explains that because oil and gas reserves occur throughout the species' gross and predicted range in Wyoming and it is unknown where future development will occur, the Finding considered where predicted range overlaps high yield sites and, based on the small amount of overlap, determined oil and gas development was not likely to be a threat. AR 14083. Plaintiffs can repeatedly assert that more specific data was available, but if that data does not speak specifically to where occupied colonies in Wyoming overlapped high yield sites—and Plaintiffs have not shown that it does—its consideration would do nothing to inform the analysis at hand. It would

in fact seem that the Service's approach errs on the side of overestimating the

potential threat of oil and gas development as it assumes all predicted range is

potentially occupied (which Plaintiffs have so ardently argued it is not). Further,

the Service's reasoned decision to estimate the threat from future oil and gas

development based on the location of high yield sites is exactly what is envisioned

by 16 U.S.C. § 1533(a)(1)(A)'s requirement that the agency evaluate present and

future destruction of habitat. Based on the information presented in the Finding,

the Service's path can be reasonably discerned and a rational connection found

between the information considered by the agency and its conclusions.

### D.    The Service adequately considered recreational shooting.

Plaintiffs contend the Service inadequately considered the threat of

recreational shooting by failing to utilize the best available science. Plaintiffs

criticize the Finding's analysis on the grounds that the Service either improperly

cited to studies focusing on the black-tailed prairie dog or improperly relied on

anecdotal evidence. Plaintiffs insist that the Service should have instead relied on

five peer-reviewed studies present in the record, which, according to Plaintiffs,

indicate shooting is a threat to the prairie dog. Plaintiffs' arguments are

contradictory and unpersuasive.

First, of the five studies cited by Plaintiffs as those studies the Service

-22-

should have looked to, four—including one extensively relied on by Plaintiffs in their brief—specifically examine recreational shooting in the context of black-tailed prairie dogs.[4]  To the extent conclusions drawn from these studies may be informative in the context of white-tailed prairie dogs, those conclusions are noted and discussed in the Finding.  AR 14090.  There is no indication that the Service ignored these studies or their limitations.  Rather, the Service supplemented the information contained therein with anecdotal evidence, noting that differences between white-tailed and black-tailed prairie dogs in areas such as population growth and colony characteristics may in turn affect the impacts of recreational shooting.  *Id.*  Plaintiffs' argument to the contrary represents a selective reading of the record.

Second, although the remaining peer-reviewed study cited by the Plaintiffs discusses both white-tail and black-tail prairie dogs, *see* Knowles, *supra* n. 2, at AR 2499, this study bases it conclusions almost entirely on anecdotal evidence, the very type of evidence Plaintiffs challenge.  Although a full-scale empirical

---

[4]     *See* Johnathan N. Pauli & Steven W. Buskirk, *Risk-disturbance overrides density dependence in a hunted colonial rodent, the black-tailed prairie dog* Cynomys ludovicianus, 44 J. Applied Ecology 1219-1230 (2007), AR 4768; Timothy C. Vosburgh & Lynn R. Irby, *Effects of Recreational Shooting on Prairie Dog Colonies*, 62 J. Wildlife Mgt. 363-372 (Jan. 1998), AR 1686; Craig J. Knowles, *An Evaluation of Shooting and Habitat Alteration for Control of Black-Tailed Prairie Dogs*, U.S.D.A. Serv., General Technical Report RM-154 (January 1988), AR 1434-35; Ken Keffer, Kelly Gordon & Stanley Anderson, *Effects of Recreational Shooting on Behavior of Black-tailed Prairie Dogs*, Progress Report (2000), AR 1863.

study of the effects of recreational shooting on the species would be preferable, "in the absence of such a study, credible anecdotal evidence represents the 'best scientific . . . data available' and cannot be ignored." *N.W. Ecosystems Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1147 (9th Cir. 2007) (emphasis omitted).  Because Plaintiffs have failed to point to any data that was omitted from consideration or explain why the Service's reliance on anecdotal evidence in addition to the peer-reviewed studies violates the "best available data" requirement, Plaintiffs' claim must fail.

### E.    The Service's determination that existing regulatory mechanisms are adequate is not reasonable in light of its threat determination for oil and gas development.

The ESA's five-factor listing framework also requires the Service to determine whether a species is threatened because of "the inadequacy of existing regulatory mechanisms."  16 U.S.C. § 1533(a)(1)(D).  The Service's determination of whether additional regulatory protection of a species is necessary is inextricably linked to the Service's threat determinations. *See Friends of Blackwater v. Salazar*, 691 F.3d 428, 436 (D.C. Cir. 2012) (holding that by considering the adequacy or inadequacy of regulations in light of other threats to the species, the Service's analysis under 16 U.S.C. § 1533(a)(1)(D) was reasonable).  When considering the inadequacy of existing regulatory mechanisms in the context of a

petition to list a species, the question is whether the existing regulatory

mechanisms are inadequate to prevent a species that is presumably decreasing in

population from becoming threatened, endangered, or even extinct.  Therefore, the

"adequacy" of a regulation is tied to the level, or even existence, of any threat the

regulation is designed to meet.  *Id*.

Here, analyzing the regulatory mechanisms across four states, four federal

agencies, and tribal lands, the Service concluded that adequate regulatory

mechanisms were in place to protect the prairie dog.  AR 14097.  The Finding

notes that although oil and gas development, grazing, fire suppression, poisoning,

and recreational shooting are all potential threats for which regulatory mechanisms

may play a role, none of these factors "rise[s] to the level of a significant threat to

the white-tailed prairie dog or its habitat rangewide."  *Id*.  Plaintiffs challenge this

determination, arguing that the Service's inadequate threats assessment resulted in

a necessarily inadequate discussion of regulatory mechanisms.  Although the

Service's threat assessment was largely adequate—as discussed above—its

determination that existing regulatory mechanisms are sufficient in the area of oil

and gas development is inconsistent with its finding that oil and gas development

poses the most significant threat to the species.

The Finding makes clear that not many regulatory protections are currently

extended to the prairie dog. The only regulations discussed to any length are the seasonal shooting closures in Colorado and Utah and the "no-surface occupancy" stipulations attached to oil and gas leases on Bureau of Land Management ("BLM") land in Utah. AR 14097. Even though few mechanisms regulate recreational shooting, the Service's determination that those that exist are sufficient is supported by the Service's threats analysis, where it found that recreational shooting was not a significant threat either individually or cumulatively. AR 14090. The same can be said for the Service's analysis of grazing, fire suppression, and poisoning. On the other hand, although the Service determined oil and gas development was not individually significant, it found that it is widespread within the species' range and may result in some habitat fragmentation. AR 14100. The regulatory mechanisms considered in the Finding do not address these concerns.

The Rangewide Conservation Agreement for the White-Tailed Prairie Dog (2006) "does not provide any regulatory protection" and Wyoming—where a majority of the future oil and gas development is expected to occur—does not have a state conservation agreement in place. AR 14095-96. Existing BLM regulations are also of limited assistance as they do not extend across the species' entire range or the entire landscape where possible oil and gas development may

occur. AR 14096; *see Greater Yellowstone Coalition, Inc.*, 665 F.3d at 1031-32

(finding the agency's determination that adequate regulatory mechanisms exist to

protect the grizzly bear was reasonable largely because the protections extended

across its range). Further, the Service may not base its determination on future

monitoring, future coordination between agencies, or voluntary actions. *Or.*

*Natural Resources Council v. Daley*, 6 F. Supp. 2d 1139, 1154 (D. Or. 1998)

("[F]or the same reason that the Secretary may not rely on future actions, he

should not be able to rely on unenforceable efforts. Absent some method of

enforcing compliance, protection of a species can never be assured. Voluntary

actions, like those planned in the future, are necessarily speculative."); *Ecology*

*Ctr, Inc. v. U.S. Forest Serv.*, 192 F.3d 922, 925 (9th Cir. 1999) (holding that

monitoring requirements set forth in a forest plan are not enforceable of subject to

judicial review under the APA because monitoring does not constitute a final

agency action). Therefore, the Service's conclusion that "[f]urther coordination

between State and Federal agencies would be of benefit to this species," AR

14097, is of little value.

    In the absence of existing regulatory mechanisms and without the ability to

rely on hopes for future regulation, the Service is left with little justification for its

finding that regulatory mechanisms as they relate to oil and gas development are

adequate in light of the threat. Although the threat may not be "significant," the Service recognizes that oil and gas development in the absence of regulation may be "detrimental to the species." AR 14096. The Service could not rationally conclude that the regulatory framework described in the Finding is sufficient to sustain the prairie dog population in light of threat posed by oil and gas development. This issue is remanded to the agency.

**III.    The Service did not adequately consider the best available science to the extent it relied on the absence of data to draw conclusions despite the existence of such data.**

Listing determinations under the ESA must be based solely on "the best scientific and commercial data available . . . ." 16 U.S.C § 1533(b)(1)(A). The failure to do so means the agency's determination is arbitrary and capricious in violation of the ESA and the APA. *Ctr. for Native Ecosystems*, 795 F. Supp. 2d at 1207. "The best available data requirement merely prohibits an agency from disregarding available scientific evidence that is in some way better than the evidence it relies on." *Kern*, 450 F.3d at 1080 (internal quotation marks and edits omitted). Plaintiffs allege numerous documents were not properly considered by the agency in its listing determination. They specifically refer to three studies: (1) *Species Assessment for the White-Tailed Prairie Dog (*Cynomys leucurus*) in Wyoming*; (2) *Pinedale—White-tailed Prairie Dog Survey*; and (3) *White-Tailed*

-28-

*Prairie Dog Conservation Assessment.*  In the absence of better data or information, Plaintiffs are correct that the Service acted arbitrarily and capriciously in failing to consider the available information.

Defendants claim the Service does not need to cite to every piece of evidence considered, but must not overlook an important aspect of the problem. This is only partially correct.  The Service did not overlook the underlying issues discussed in these studies, which includes such matters as the effects of oil and gas development.  However, the Finding relies on an absence of information in this area in reaching its conclusion, stating: "No studies have been done regarding the short-term or long-term impact of oil and gas development on individual white-tailed prairie dogs or their colonies."  AR 14081.  While the Court is not in the position to tell the Service that it must rely on the data cited by Plaintiffs, the Service nonetheless must explain why it disregarded available data in favor of drawing a conclusion based on a dearth of data.  In regards to the Pinedale Survey and the Biological Evaluation, for example, the Service need not rely on this data, but it cannot ignore it in the absence of any other data.  On the other hand, Plaintiffs themselves note that the Finding repeatedly cites to the Conservation Assessment, demonstrating the Service did not omit it from its consideration.  *See Kern*, 450 F.3d at 1081.

-29-

Although the Service is not required to consider an entire universe of information in reaching its conclusion, it acted arbitrarily and capriciously when it disregarded available information. The Service is entitled to deference in the scientific studies and data it relies upon and, to the extent the agency's path can be reasonably discerned and is supported by the record, deference is due to the agency's expertise. However, when information or data is available in an area where the Service has said there is none or the Service fails to explain why it chose not to rely on information presented to it, the Service has failed to rely on the best available data in violation of the ESA. To the extent Defendants now argue the available data is somehow unreliable or inaccurate, these arguments are not present in record and are post-hoc rationalizations that cannot be considered. Remand for further consideration by the agency in accordance with this order is mandated.

## CONCLUSION

The Service relied on an absence of data to draw numerous conclusions regarding the prairie dog in its Finding. The Service's failure to explain its analysis and conclusions to the extent discussed above makes its determination arbitrary, capricious, and in violation of the ESA. Further, the Service has cited to a lack of information to draw conclusions in areas where Plaintiffs have shown

-30-

data was present.  To the extent the Service ignored that data without explanation, the Service has failed to rely on the best available science as required by the ESA.

Accordingly, Plaintiffs' motion for summary judgment (Doc. 19) is GRANTED as it relates to the Service's failure to consider historical range, its cursory disregard of individual threats without considering their potential for cumulative impacts, its unreasonable conclusion regarding regulatory mechanisms for oil and gas development, and its failure to rely on the best available science when such data was in fact available.  Defendants' motion (Doc. 30) is GRANTED in all other respects.

The Finding is remanded to the agency for further consideration consistent with this order.

The Clerk of Court is directed to close this case.

Dated this 27 day of September, 2014.

12:52 P.M

Donald W. Molloy, District Judge
United States District Court